## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KELLY STAPLETON,

    Plaintiff,

        v.

UNION PACIFIC RAILROAD
COMPANY,

    Defendant.

Case No. 16-cv-00889

Judge Martha M. Pacold

## MEMORANDUM OPINON AND ORDER

Kelly Stapleton filed this lawsuit against his former employer, Union Pacific Railroad Company, for violations of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, *et seq.*, and the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109. Judge Wood granted Union Pacific's motion for partial summary judgment on Stapleton's FRSA claim. Stapleton's FELA claim will be heard in a bench trial. In anticipation of trial, both parties filed motions to exclude expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Stapleton moved to exclude the testimony of Anne Mathias [78]. Union Pacific moved to exclude certain testimony of Dennis Gates [80], the testimony of Terry Cordray [82], and the testimony of Malcolm Cohen [84]. For the reasons explained below, all four motions are denied.

## BACKGROUND

The factual background is set forth in Judge Wood's February 1, 2018 Memorandum Opinion and Order. (Dkt. 60.) The court assumes familiarity with that order, and summarizes only the facts and procedural history relevant to the pending expert motions here. Additional facts relevant to specific experts are included in the analysis of each motion below.

On January 19, 2015, Stapleton was involved in a locomotive crash while he was working for Union Pacific as a locomotive engineer. (Dkt. 53, Ans. at 1–2.)[1] Stapleton filed a personal injury report with Union Pacific following the crash.

---

[1] Docket entries are cited as "Dkt. [docket number]" followed by the page or paragraph number. Page number citations refer to the ECF page number, which may differ from the original page numbering.

(Dkt. 60 at 2.) After seeking medical treatment, Stapleton filed a release to return to work. Union Pacific's Associate Medical Director, Dr. John Charbonneau, reviewed Stapleton's medical records, and determined that even though Stapleton was clear to return to work in relation to the January 2015 injury, because he had a history of seizures and was taking the prescription drug Lamictal, he should receive a fitness-for-duty evaluation. (*Id*.) Additional Union Pacific doctors reviewed Stapleton's medical history (*id*.), and placed him on the following work restrictions:

1. Not to operate company vehicles, on-track or mobile equipment, or fork-lifts.
2. Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers.
3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.
4. Not to work at unprotected heights, over 4 feet above the ground.
5. Not to do work where decisions or actions can affect the safety of others, or have a significant impact on business operations.
6. These work restrictions are permanent.

(*Id*. at 3.) Stapleton has not been permitted to return to work since the crash. (Dkt. 53, Ans. at 4–5.)

In his complaint, Stapleton brought a claim under the FELA and a claim under the FRSA. (Dkt. 1.) "In Count I of his Complaint, Stapleton allege[d] that Union Pacific was negligent and breached its duty under FELA by failing to provide him with a reasonably safe place to work, resulting in the crash in which he was injured. In Count II, he claim[ed] that Union Pacific violated the FRSA by refusing to allow him to return to work in retaliation for his reporting of his injury and the hazardous safety condition that contributed to it." (Dkt. 60 at 1.) Union Pacific moved for partial summary judgment on Stapleton's FRSA claim, not on the FELA claim. (Dkt. 36.) The court granted Union Pacific's motion because "the undisputed record demonstrates that Union Pacific's actions fall under the plain language of the FRSA's safe harbor provision." (Dkt. 60 at 6.) The FRSA's safe harbor provision states:

> [A] railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty.

(*Id*. (quoting 49 U.S.C. § 20109).) The court did not reach Union Pacific's arguments regarding whether Stapleton could establish a *prima facie* case under the FRSA or

whether Union Pacific would have taken the same actions with respect to Stapleton's employment regardless of his reports. (Dkt. 60 at 5.)

Stapleton's FELA claim remains to be heard at trial. Both sides move to exclude certain expert testimony. Stapleton moves to exclude Union Pacific's accident reconstruction and biomechanical expert, Anne Mathias. (Dkt. 78.) Union Pacific moves to exclude Stapleton's medical expert, Dennis Gates (Dkt. 80); his vocation rehabilitation expert, Terry L. Cordray (Dkt. 82); and his damages expert, Malcolm S. Cohen (Dkt. 84). The case was reassigned to this judge in 2019. (Dkt. 100.)

## LEGAL STANDARD

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert*[.]" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Before admitting expert testimony, the court must determine whether the proposed testimony is both relevant and reliable. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). This requires a three-step analysis. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Rule 702). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Second, the expert's reasoning or methodology must be scientifically reliable. *Ervin*, 492 F.3d at 904. District courts have broad latitude when deciding whether an expert's testimony is reliable. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). *Daubert* set forth the following non-exhaustive factors that may be pertinent for determining reliability: "1) 'whether [the expert's theory] can be (and has been) tested'; 2) 'whether the theory or technique has been subjected to peer

review and publication'; 3) 'the known or potential rate of error'; and 4) 'general acceptance' among the relevant scientific community." *Smith*, 215 F.3d at 719 (quoting *Daubert*, 509 U.S. at 593–94); *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). Third, the testimony must be relevant; that is, it must assist the trier of fact in understanding the evidence or determining a fact at issue. *Ervin*, 492 F.3d at 904.

While the district court serves as a "gatekeeper," it must be mindful that "the key to the gate is not the ultimate correctness of the expert's conclusions," but "the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The party offering expert testimony bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Determinations on admissibility, however, "should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

Neither party demanded a jury trial. "Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point." *Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016); *see also Estate of Stuller v. United States*, 811 F.3d 890, 895 n.3 (7th Cir. 2016) ("In the context of a bench trial, postponing the *Daubert* ruling until after trial was not error. Where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.") (citation, internal quotation marks, and brackets omitted). Thus, the court could defer ruling on the *Daubert* motions at this stage and could consider the arguments raised in the motions during or after the bench trial. Instead, in the interest of efficiency, the court analyzes the arguments as follows and denies the motions on the current record, but notes that this ruling is subject to modification based on the experts' testimony at trial.

## ANALYSIS

## I. Union Pacific's Accident Reconstruction and Biomechanical Expert Anne Mathias

Union Pacific retained Anne Mathias as an expert and asked her to conduct an accident reconstruction and biomechanical analysis of the incident. (Dkt. 79-5 at 4.) Mathias provided a report that she co-authored with her colleague G. Stanley Sangdahl III. (*Id.*) Mathias also provided an affidavit regarding her methodologies. (Dkt. 91-1.)

In her report, Mathias offers eleven conclusions derived from her engineering investigation. (Dkt. 79-5 at 15–16.) Conclusions One through Four describe the locations of the locomotives and hopper cars involved and describe the collision. (*Id.*) Conclusion Five states: "The speeds at which this collision took place were 5 mph or less. The average longitudinal deceleration of the locomotives in stopping was less than 0.1 g which is equivalent to a normal stop in an automobile." (*Id.* at 16.) Conclusions Six and Seven describe how the deceleration described in Conclusion Five would or would not have affected the two locomotives, including the locomotive that Stapleton was operating. (*Id.*) Conclusions Eight through Eleven state that "[d]uring the subject incident, Mr. Stapleton may have initially moved forward due to the deceleration of his locomotive"; "[t]he acceleration associated with the subject incident would not have caused Mr. Stapleton's head and/or shoulder to contact the right window and then cause him to fall forward onto the floor"; "[v]ehicle decelerations of 0.1 g are very low and considered well below the threshold as safe for volunteer activities"; and "[t]he accelerations experienced by Mr. Stapleton in the subject incident are less than those experienced during routine travel in passenger vehicles, trains, and buses." (*Id.*)

Stapleton now moves to exclude Mathias's opinions under *Daubert* and Rule 702 because, Stapleton contends, (a) Mathias is not qualified in railroad accident reconstruction or as a medical doctor and (b) her opinions are unreliable. (*See* Dkt. 79.) The court addresses Stapleton's arguments in turn below.

*A. Qualifications*

Stapleton contends that Mathias is not qualified to offer the opinions in her report because Mathias lacks knowledge, experience, or education in railroad accident reconstruction and medical causation. (Dkt. 79 at 5–6.) The court declines to exclude Mathias's testimony on this basis.

Whether Mathias is qualified to offer the opinions in her report must be determined "by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616. Union Pacific asked Engineering Systems Inc "to perform a technical accident investigation and engineering analysis" of the January 19, 2015 incident; Sangdahl "was asked to conduct an accident reconstruction" incident and Mathias "was asked to conduct a biomechanical analysis" of the incident. (Dkt. 79-5 at 4.) Mathias asked Sangdahl "to work under her direction and in conjunction with [her] to perform an accident reconstruction," "confirmed, incorporated, and adopted" his findings, and "conducted a biomechanical analysis" based on the accident reconstruction, as well as her own site inspection, review of materials, and evaluation. (Dkt. 91-1 at 5 ¶¶ 13–17.)

Mathias's report reaches eleven conclusions. As described above, a number of them (the first four) describe the positions of the locomotives and hopper cars involved in the accident and the general circumstances of the collision. One concerns both the speeds at which the collision took place and the average longitudinal deceleration of the locomotives involved in the accident, including that the speeds "were 5 mph or less" and the deceleration "was less than 0.1 g which is equivalent to a normal stop in an automobile." (Dkt. 79-5 at 16.) Others opine on how the deceleration described in Conclusion Five would or would not have affected the two locomotives. (*Id.*) Others state that "[d]uring the subject incident, Mr. Stapleton may have initially moved forward due to the deceleration of his locomotive"; "[t]he acceleration associated with the subject incident would not have caused Mr. Stapleton's head and/or shoulder to contact the right window and then cause him to fall forward onto the floor"; "[v]ehicle decelerations of 0.1 g are very low and considered well below the threshold as safe for volunteer activities"; and "[t]he accelerations experienced by Mr. Stapleton in the subject incident are less than those experienced during routine travel in passenger vehicles, trains, and buses." (*Id.*)

Mathias has sufficiently demonstrated her qualifications to offer opinions in her report. Mathias was not deposed, but she provided an affidavit. (Dkt. 91-1.) Mathias is a licensed professional engineer in three states. (Dkt. 91-2 at 1; Dkt. 91-1 at 2 ¶ 4.) She has a bachelor's degree in mechanical engineering and master's degrees in biomedical and mechanical engineering. (Dkt 91-2 at 1; Dkt. 91-1 at 1–2 ¶ 4.) She has worked as an engineer since 2005. (Dkt. 91-2 at 2.) Over the past 12 years, she has consulted with at least three railroads investigating accidents and injuries, worked on incident reconstructions from videos, ergonomic assessments, and biomechanical analyses, made site inspections of incident scenes, and co-authored "Methods of Accident Reconstruction: Biomechanical and Human Factors Considerations," published in the *Proceedings of the ASME 2015 International Mechanical Engineering Conference and Exposition.* (Dkt. 91-1 at 2 ¶¶ 6–7; *id.* at 3 ¶ 11; Dkt. 91 at 3.) She states that "[a]ccounting for railroad and non-railroad cases alike, I have been involved in over 100 cases where accident reconstruction analysis is performed and on which I rely for my opinions. As part of this effort, I have personally performed biomechanical analyses of all types of motorized vehicles operated by humans." (Dkt. 91-1 at 2 ¶ 8.) After Union Pacific responded to Stapleton's argument about Mathias's qualifications (Dkt. 91 at 3–4), Stapleton did not pursue this argument on reply (Dkt. 95). Mathias's knowledge, experience, training, and education sufficiently demonstrate that she is qualified to offer the opinions presented in her report.

As to medical causation opinions, Stapleton contends generally that "engineering experts cannot offer specific causation opinions" and "only medical doctors can opine as to a particular individual's injuries resulting from an incident." (Dkt. 79 at 10.) "[S]ome courts have found medical causation testimony from

qualified biomechanical engineers inadmissible under *Daubert*. . . . But many courts also have allowed this testimony, particularly within this district." *Gecker as Tr. for Collins v. Menard, Inc.*, No. 16-cv-50153, 2019 WL 3778071, at *7 (N.D. Ill. Aug. 12, 2019) (citing cases). Stapleton does not identify which specific opinion or opinions in Mathias's report could be considered a "medical causation" opinion. Mathias does offer the following opinions, among others: "During the subject incident, Mr. Stapleton may have initially moved forward due to the deceleration of his locomotive"; "[t]he acceleration associated with the subject incident would not have caused Mr. Stapleton's head and/or shoulder to contact the right window and then cause him to fall forward onto the floor"; "[t]he accelerations experienced by Mr. Stapleton in the subject incident are less than those experienced during routine travel in passenger vehicles, trains, and buses." (Dkt. 79-5 at 16.) It is not clear that these opinions amount to "medical causation" opinions of the sort that some courts have prohibited.

In any event, these opinions appear consistent with the types of opinions that other courts in this district have permitted biomechanical engineers to give. *Gecker*, 2019 WL 3778071, at *8 ("The Court . . . is persuaded that the expert testimony of a biomechanical engineer regarding the forces and kinematic impact of an accident serves a different purpose than expert testimony typically offered by a medical doctor. . . . The traditional role of the physician is the diagnosis (identification) of injuries and their treatment, not necessarily a detailed assessment of the physical forces and motions that created injuries during a specific event.") (citation and internal quotation marks omitted); *Pike v. Premier Transportation & Warehousing, Inc.*, No. 13-cv-08835, 2016 WL 6599940, at *3–4 (N.D. Ill. Nov. 8, 2016); *McKeon v. City of Morris*, No. 14-cv-02084, 2016 WL 5373068, at *2 (N.D. Ill. Sept. 26, 2016); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 740, 742-44 (N.D. Ill. 2005); *cf. Kelham v. CSX Transportation, Inc.*, 840 F.3d 469, 471 (7th Cir. 2016) ("A biomechanical engineer testified for the railroad that the forward lurch of the locomotive should have pushed Kelham backward rather than forward, since he was facing the front of the train at the time of the accident. . . . The engineer further testified that if the lurch had pushed Kelham backward without causing him to hit the back wall of the locomotive cab, it would have been too weak to injure him.").

Mathias may not offer a medical diagnosis or other opinions that would require the qualifications of a medical doctor. *See Gecker*, 2019 WL 3778071, at *8 (biomechanical engineer "has proffered that he does not intend to diagnose Plaintiff with a medical condition, opine as to whether the medical treatment she received was appropriate, or speculate as to any future medical treatment she may require"). But Mathias is qualified to offer the biomechanical opinions in her report.

In his motion to exclude, Stapleton also states that Mathias's co-author, G. Stanley Sangdahl III, was not disclosed as an expert witness. (Dkt. 79 at 2–3.) It is unclear whether Stapleton argues for exclusion on this basis. To the extent

Stapleton may be raising this argument, it is not persuasive.  In the affidavit, Mathias explains that she asked Sangdahl to work under her direction and in conjunction with her to perform an accident reconstruction, that she "confirmed, incorporated, and adopted the findings made by Mr. Sangdahl under my direction," "verified the data and conclusions in all respects," performed her own site inspection along with Sangdahl (Sangdahl also made two additional site visits to collect data on which Mathias relied), and performed her own review of materials and evaluation.  (Dkt. 91-1 at 5–6 ¶¶ 13–17.)  Mathias's reliance on a colleague's work is not in and of itself a basis for exclusion.  *Gecker*, 2019 WL 3778071, at *6 ("[T]he mere fact that Dr. Fisher did not investigate the scene himself, or take his own measurements of the accident scene, does not justify exclusion. . . . Nor does Dr. Fisher's use of a colleague's measurements, notwithstanding whether Dr. Fisher subsequently analyzed and expanded upon them, affect the Court's *Daubert* analysis.").

## B. Reliability

Stapleton next contends that Mathias's opinions are unreliable because they are not based on sufficient facts and are not derived from generally accepted methods.  (Dkt. 79 at 6–9.)

First, Stapleton argues that Mathias lacked sufficient evidentiary foundation for her opinions, including her opinion that the average longitudinal deceleration of the locomotives was "equivalent to a normal stop in an automobile."  Stapleton contends, for example, that Mathias lacked a sufficient factual basis because "[t]he facts in evidence are that the impact from the collision caused Stapleton's body to be thrown back and forth, with his head and shoulder hitting the window and ultimately causing Stapleton to be thrown to the ground."  (Dkt. 79 at 9.)  But Mathias's report shows that she considered Stapleton's descriptions of the incident from his deposition and medical records.  (Dkt. 79-5 at 4, 12–13.)  In addition, Mathias's report states that she reviewed, among other things, photographs taken shortly after the crash and during subsequent visits, records and a witness statement from the crash, a map of the railyard, dimensional data for the locomotives and rail cars involved, Stapleton's medical records, and deposition testimony from Stapleton and his doctors.  (Dkt. 79-5 at 4–5.)  These facts are sufficient.

Stapleton lists in the reply brief a number of values that could have been used in a calculation to determine force.  (Dkt. 95 at 2.)  But these and Stapleton's other factual criticisms go to the weight of Mathias's opinions, not their admissibility.  *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").  These criticisms can be addressed through cross-examination.  *Cooper v.*

*Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (June 1, 2000) ("The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010).

In his reply brief, Stapleton further contends that the only evidence of speed Mathias had was a statement to a doctor included in a medical record, which is insufficient. (Dkt. 95 at 3–4.) Arguments made for the first time in a reply brief are typically waived, *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 768 (7th Cir. 2018), but this argument too goes to the weight of Mathias's opinions, not their admissibility. *See Smith*, 215 F.3d at 718. Mathias's report does appear to rely significantly on the 5 mph figure. But any questions about the reliance on this figure or other facts are matters for cross-examination, not bars to admissibility.

Second, Stapleton argues that Mathias's methodology is unreliable because there is no evidence to show that her methodology "has been tested or subject to peer review and publication," and "[t]here is a large analytical gap between the facts of th[e] case and Mathias's proffered opinions." (Dkt. 79 at 7–9.) Stapleton relies heavily on *Whiting v. Coultrip*, 324 Ill. App. 3d 161, 755 N.E.2d 494 (2001), in which the court excluded the testimony of two engineers, one of whom was a biomechanical and biomedical engineer. Stapleton argues that, as in *Whiting*, "Mathias reviewed photographs of the damaged equipment and read the parties' deposition transcripts," but "the record is devoid of any demonstration by UP that these methods employed by Mathias are generally accepted and empirically tested methods in the field of engineering in determining G-forces." (Dkt. 79 at 8.)

*Whiting* does not control the analysis. It applied principles of Illinois law that are not applicable here. *Whiting*, 324 Ill. App. 3d at 165–66 ("After determining that Illinois currently utilizes a "*Frye* plus reliability" standard for the admission of such evidence, the *Cropmate* court set forth an exhaustive six-inquiry approach for determining whether novel scientific evidence is reliable."). Also, it explained that the evidence at issue was novel at the time:

> After an exhaustive search, we find no Illinois cases wherein a biomedical engineer was even certified as an expert, let alone permitted to testify that plaintiff's injuries were not consistent with the type of accident sustained. Additionally, we find less than a handful of cases nationwide in which the admissibility of the testimony of a biomedical engineer was considered; one in which that testimony was held to be novel scientific evidence.

*Id.* at 167. Against that background, the court concluded that the proponent of the evidence "did not sufficiently demonstrate that [the experts] utilized generally

accepted and empirically tested methods in determining that plaintiff could not have sustained the type of injury claimed." *Id.* at 169.

Reliability is of course required for the admission of expert testimony. And, while district courts have broad latitude when deciding whether an expert's testimony is reliable, *Bryant*, 200 F.3d at 1098, an expert may not "simply assert a 'bottom line'" or base her opinion on "subjective belief or speculation," *Metavante*, 619 F.3d at 761. Rather, an expert's testimony must demonstrate "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

As noted above, *Daubert* set forth the following non-exhaustive factors that may be pertinent for determining reliability: "1) 'whether [the expert's theory] can be (and has been) tested'; 2) 'whether the theory or technique has been subjected to peer review and publication'; 3) 'the known or potential rate of error'; and 4) 'general acceptance' among the relevant scientific community." *Smith*, 215 F.3d at 719 (quoting *Daubert*, 509 U.S. at 593–94). At the same time:

> [A]s the Supreme Court has repeatedly emphasized, the Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. . . . The trial court must use the criteria relevant to a particular kind of expertise in a specific case to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Smith*, 215 F.3d at 719 (citations and internal quotation marks omitted). Put another way, the types and complexity of expert analyses vary from case to case; therefore "district courts are not beholden to the four *Daubert* factors—a case-by-case analysis is often in order." *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 741 (N.D. Ill. 2005).

As to the methodology Mathias employed, Mathias's report states that she, or a colleague working under her direction, reviewed materials including, among other things, photographs taken shortly after the crash and during subsequent visits, records and a witness statement from the crash, a map of the railyard, dimensional data for the locomotives and rail cars involved, Stapleton's medical records, and deposition testimony from Stapleton and his doctors. (Dkt. 79-5 at 4–5.) They inspected the site, took photographs of the locomotive and performed 3D FARO laser scanning, inspected exemplar locomotives and took photographs and performed 3D FARO laser scanning, and inspected the cab of an exemplar locomotive (and took photographs, made measurements of the engineer's operational area, and made a 3D FARO laser scan). (*Id.* at 5.)

10

The report then walks through a background incident description "[b]ased on the statements, reports, testimony and photographs of the accident damage to the rail equipment." (*Id.* at 7.) The background incident description says that "[r]eportedly, both the locomotives and the hopper cars were traveling at speeds of 5 mph or less . . . ." (Dkt. 79-5 at 9.)

The report then provides an accident reconstruction analysis that discusses the angle between the intersecting tracks, the damage to the rail equipment, and the forces on the locomotive, hopper car, and rails (*e.g.*, the lateral forces between the locomotive and hopper car, the vertical load on the rail from the hopper car, and the lateral load limit of the rails). (*Id.* at 10–12.) The accident reconstruction analysis reaches conclusions about the longitudinal deceleration and the lateral (or rocking) motion of the locomotives. As to the longitudinal deceleration, the report states in part:

> It is estimated that the overall distance traveled by the locomotives after first contact with the hopper car is approximately 10 feet until they came to rest. Stopping over this distance from a speed of 5 mph creates an average longitudinal deceleration of less than 0.1 g's or one-tenth the acceleration due to gravity. This level of deceleration is approximately equivalent to an automobile stopping normally for a stop sign.

(*Id.* at 10–11.) As to the lateral motion, the report states in part that "there would be little or no rocking motion produced during the collision which would also be attenuated by the coupler." (*Id.* at 12.)

The report next walks through a biomechanical analysis. The analysis reviews Stapleton's description of the incident, compares it to the conclusions in the accident reconstruction section of the report (as to both lateral movement and longitudinal deceleration, including the less than 0.1 g figure), and concludes that the description and the accident reconstruction conclusions are inconsistent. (*Id.* at 12–15.) Based on the accident reconstruction and biomechanical analyses, the report reaches the eleven conclusions described above. (*Id.* at 15–16.)

Besides the report, Mathias also submitted an affidavit in opposition to Stapleton's motion. (As noted above, Mathias was not deposed.) According to the affidavit, Mathias used the data she collected to reconstruct the accident "utiliz[ing] biomechanics, injury analysis, and human factors as critical analysis components." (Dkt. 91-1, at 3 ¶ 10.) Mathias states that this approach is widely accepted in the biomechanics community and has been published in peer-reviewed journals, including those she cites in her report and affidavit (including an article she co-authored). (*Id.* at 3 ¶¶ 10–11.) She states: "At the root of each biomechanical analysis is consistency with the laws of physics and accounting for all the available

physical evidence.  When analyzing the data gathered and developed from the man, product/machine, and environment, the physics of all interactions between and within these groups must be consistent."  (*Id.* at 3 ¶ 12.)  She also includes a flow chart from an article she co-authored that lists general categories of data to be gathered and states, "Physics Of All Interactions Must Be Consistent."  (*Id.* at 4 ¶ 12.)

Mathias explains that she applied the method to this case by confirming Sangdahl's accident reconstruction, making a site inspection, and reviewing photographs and other materials.  (*Id.* at 5 ¶¶ 13–15.)  She reviewed various categories of data described in her affidavit.  (*Id.* at 5 ¶ 16.)  Relying on the accident reconstruction data, she applied her "experience analyzing occupant motion behavior in vehicles and basic physics concepts" to "evaluate[ ] the direction and the relative severity of Mr. Stapleton's accelerations post impact."  (*Id.* at 6 ¶ 17.)

Mathias's report reflects that she and her colleague (acting at her direction) gathered and analyzed a substantial amount of information, photos, and measurements, including through reviewing records, inspecting the site, and inspecting exemplar locomotives.  The types of information Mathias reviewed are similar to the types of information other engineers have reviewed in offering expert testimony regarding accidents in this district.  *See Paine ex rel. Eilman v. Johnson*, No. 06-cv-03173, 2010 WL 749857, at *2 (N.D. Ill. Feb. 25, 2010) ("Dix's report reflects that his case review and accident reconstruction was based upon a variety of relevant information, including the California traffic collision report, photographs of the vehicle after the accident, photographs of the accident site, and extensive mechanical and structural information about Eilman's car and the objects with which it collided during the accident.  These types of materials are appropriate foundations upon which an expert in mechanical engineering may reconstruct an accident.").

On the other hand, more information would assist the court in assessing the reliability of the methodology, for several reasons.

First, Mathias's descriptions of the methodology and flowchart are often fairly general.  *E.g.*, Dkt. 91-1, at 3 ¶ 10 (Mathias used the data she collected to reconstruct the accident "utiliz[ing] biomechanics, injury analysis, and human factors as critical analysis components"); *id.* at 3 ¶ 12 ("At the root of each biomechanical analysis is consistency with the laws of physics and accounting for all the available physical evidence.  When analyzing the data gathered and developed from the man, product/machine, and environment, the physics of all interactions between and within these groups must be consistent."); *id.* at 6 ¶ 17 (Mathias applied her "experience analyzing occupant motion behavior in vehicles and basic physics concepts" to "evaluate[ ] the direction and the relative severity of Mr.

Stapleton's accelerations post impact"). Further explanation of the process Mathias followed would assist the court in evaluating the reliability of the methodology.

Second and relatedly, additional information about how Mathias's approach compares to that employed in the biomechanics field would be helpful. Mathias states that the approach she employed "is widely accepted in the biomechanics community and has been published in peer-reviewed journal publications" (citing an example article) as well as in a publication she co-authored. (*Id.* at 3 ¶¶ 10–11.) At a high level, the steps Mathias took as described in her report, including gathering a variety of data and records about the incident, reviewing photographs, inspecting the site, and inspecting exemplar locomotives, appear generally similar to the process employed by other engineers in accident cases in this district. *Gecker*, 2019 WL 3778071, at *3; *Pike v. Premier Transportation & Warehousing, Inc.*, No. 13-cv-08835, 2016 WL 6599940, at *5 (N.D. Ill. Nov. 8, 2016); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 742–43 (N.D. Ill. 2005). But again, because Mathias's descriptions of her approach to analyzing the data she gathered are general, some further explanation of whether there is a process that is generally followed in the field and, if so, how Mathias's process compares to it, would be helpful. *See Smith*, 215 F.3d at 721 ("the general acceptance of the techniques in the relevant engineering and accident analysis communities or the extent of the experts' practical experience performing those techniques, may bear on the reliability of the proposed evidence"); *cf. Phillips*, 364 F. Supp. 2d at 743 ("there is no one singular, strict methodology in the industry (Pl.Ex. 4, Vol. 1 at 229: 18–20), so the importance of general acceptance is reduced").

Third and relatedly, in other accident cases from this district involving engineer experts, in addition to reviewing reports, photographs, and other materials, some of the experts appear to have used testing, computer simulations, or other modeling. *E.g.*, *Gecker*, 2019 WL 3778071, at *4–7; *Pike*, 2016 WL 6599940, at *5; *Phillips*, 364 F. Supp. 2d at 740–41, 743. Reliability is a case-specific analysis, and it is not clear that such testing or modeling is necessarily required for the type of analysis Mathias conducted. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996); *Phillips*, 364 F. Supp. 2d at 743–44 (depending on the type of analysis, there may be instances in which "the process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology," and, again depending on the type of analysis, it may be that "gathering relevant information and applying one's training, experience, and knowledge to a process of analyzing the information is a matter of common sense, and it has been deemed 'reasonable' (and thus, presumably, acceptable) by the Seventh Circuit"); *Paine*, 2010 WL 749857, at *2. Mathias and her colleague did multiple site inspections and gathered and reviewed a significant amount of data. But again, understanding Mathias's process better, including the decision whether or not to conduct testing,

computer simulations, or modeling, and how that compares to the methods generally employed in the field, would assist the court in evaluating reliability.

Fourth, the report relies significantly on the "less than 0.1 g" figure but does not walk through the calculations that led to that figure, other than to point out that stopping over a distance of approximately 10 feet from a speed of 5 mph "creates an average longitudinal deceleration of less than 0.1 g's." (*See* Dkt. 79-5 at 10.) Even if this calculation is straightforward using basic physics equations, it would be helpful to confirm how it was done. *Metavante*, 619 F.3d at 761 ("Rule 702 does require . . . that the expert explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line.") (citations and quotation marks omitted).

As noted above, the report contains a substantial amount of information and analysis. Since this case involves a bench trial, the areas described above where additional information would be helpful can be explored at trial. Also, a deposition could have shed more light on some of these areas, but Mathias was not deposed. Under all these circumstances, the court denies the motion without prejudice to renewal at trial or another appropriate time.

## II. Stapleton's Medical Expert Dennis J. Gates, M.D.

Stapleton retained Dennis Gates, an orthopedic surgeon, to offer medical opinions regarding Stapleton's injuries, the cause of his injuries, his disability, and his prognosis. (Dkt. 90 at 1; Dkt. 90-1 at 2–5.) Dr. Gates provided a report (Dkt. 90-1), provided updated catalogs of records and chronologies for his report (Dkt. 90 at 6; Dkt. 113), and has been deposed (Dkt. 81-1). Union Pacific seeks to exclude certain opinions by Dr. Gates regarding Stapleton's ability to work, specifically references in Dr. Gates's report to "work restrictions" of not lifting more than 50 pounds and not working in a vibratory environment. (Dkt. 80 at 1 ¶ 2; Dkt. 81 at 1.) Union Pacific notes that plaintiff's other experts (vocational and economic experts) rely on Dr. Gates's opinions about plaintiff's work restrictions. (Dkt. 81 at 1.) But Union Pacific contends that Dr. Gates is unqualified to offer opinions regarding Stapleton's ability to work. Union Pacific also argues that these opinions are unreliable because they lack a factual basis and are not the product of a reliable method. (Dkt. 80 at 1–2; Dkt. 81 at 1, 4–7.)

### A. Qualifications

Dr. Gates reviewed Stapleton's medical records and interviewed and examined Stapleton. (Dkt. 90-1 at 2.) In the report, Dr. Gates gave the following opinions, including an opinion regarding Stapleton's ability to work at the end of the excerpt below:

14

**Impression:**
1. Post-traumatic thoracic pain, soft tissue, chronic
2. Thoracic syrinx T2-4, probably post-traumatic
3. Post Traumatic Stress Disorder.

**Causation:**
It is with a reasonable degree of medical certainty that the accident of 1-19-15 caused the diagnoses above, necessitated the treatment he has had and will have, and is responsible for his current condition.

It should be noted he never had this diagnosis before and he never had any pain in the area before.

**Prognosis:**
Guarded. I don't know what is going to happen. This could be a permanent condition.

**Disability:**
The patient wants to return to work as an Engineer, but his pain is preventing that right now; he can't [d]o the required lifting, climbing, etc. And there are the vibrations and jarrings while being on the train. Then there is his anxiety and PTSD – to be addressed by his Psychologist. There should be work restrictions of no vibrations and no lifting greater than 50 lbs.

(Dkt. 90-1 at 4.)

At Dr. Gates's deposition, when asked about this opinion, he answered as follows:

Q. The work restrictions that you indicated on the bottom of Page 3 of Exhibit 1, there should be no vibrations greater than 50 pounds. You imposed those on . . . January 6th of 2017 when you saw him?

A. No. I agreed with them, and I don't have that in the record that they were imposed so I called him and just asked him, where did you get that from, and he said someone told me that.

. . .

Q. What did you call him for?

A. To find out where that came from because I couldn't find it in the record.

Q.  The work restrictions?

A.  Yes.

Q.  What did he tell you?

A.  He said he was told verbally.

Q.  By who?

A.  He doesn't remember.

Q.  So when you put him [sic] in your report, you were just recording what he told you his restrictions were?

A.  Well, he told me that, and I agreed with it.  It makes sense to me.  If I had seen him as a regular patient – remember, I don't give work restrictions per se.  But if I had seen him as a regular patient with this condition and so forth, yes, I would have put down absolutely no vibrations and no lifting greater than about 50 pounds, and no jarring.

Q.  Well, in fairness, you said there should be work restrictions of no vibrations and no lifting –

A.  Yeah, good.  Yes.

Q.  So that was an opinion you had at the time you drafted this; right?

A.  Yes.

Q.  But you didn't know the source of that?

A.  Correct. Good point. Good point.

Q.  In terms of his prognosis – well, having talked to him this morning, did you ask him any other questions besides where this – where he got the 50-pound lifting restriction and the no vibrations?

A.  No.

Q.  So you didn't independently come up with the restriction that he shouldn't return to vibratory environment or lift greater than 50 pounds?

16

A. Honestly, I can't tell you that. It's in here. He had told me this before also. I mean, that's really why I'm merely agreeing with it. I agree with work restrictions of no vibrations and no lifting greater than 50 pounds. I like that better.

Q. Is that more accurate?

A. Yes.

Q. You agree with whomever told him that, but you don't know who it was that told him that?

A. Correct.

Q. And you haven't seen an FCE?

A. No. He didn't have – I'm not aware that he had an FCE.[2]

Q. Okay. And you didn't put him through any paces to see what physical restrictions he would have in your examination?

A. No.

. . .

Q. Did you – back to my other question. Do you know whether he's working anywhere whether it's at the railroad or anywhere else right now?

A. I don't know. I don't know. I would doubt it. I would doubt that he'd be working at any physical job with that spinal cord stimulator.

(Dkt. 81-1 at 14–15, Gates Dep. 55:3–59:9.)

Union Pacific argues that Dr. Gates was not qualified to give the opinion that "[t]here should be work restrictions of no vibrations and no lifting greater than 50 lbs." Union Pacific does not challenge Dr. Gates's qualifications as an orthopedic surgeon. But Union Pacific contends that Dr. Gates "is not qualified to offer such

---

[2] "FCE" stands for "functional capacity evaluation" (*see* Dkt. 81 at 7); the parties do not appear to provide further description, but it is used "to assess a patient's current physical and functional abilities and potential to return to work." *Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 331 (7th Cir. 2012).

an opinion because he is not Plaintiff's treating physician and does not give work restrictions." (Dkt. 80 at 2 ¶ 4.)

As an initial matter, it is unclear whether the argument is truly about Dr. Gates's qualifications, as opposed to the factual foundation for his opinion (addressed separately below). *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.' . . . So, the fact that Dr. Weinstein is not a cardiologist does not prevent him from testifying regarding Taylor's death; instead, we must look at each of the conclusions he draws individually *to see if he has the adequate education, skill, and training to reach them*.") (emphasis added). The question is whether Dr. Gates has adequate education, skill, and training to testify regarding Stapleton's work restrictions. Union Pacific does not challenge Dr. Gates's education, skill, or training or argue that these qualifications are insufficient to allow Dr. Gates to opine on work restrictions.

In any event, Dr. Gates has sufficient qualifications to do so. He is a physician and board-certified orthopedic surgeon. He graduated from medical school in 1965, completed residency and fellowship programs in general surgery, orthopedic surgery, and integrative medicine, and has been licensed to practice medicine in Illinois since 1968. (Dkt. 113 at 63.) While a medical degree does not qualify a doctor to opine on all medical subjects, a "physician in general practice is competent to testify about problems that a medical specialist typically treats." *Gayton*, 593 F.3d at 617 (citations omitted). Dr. Gates's opinions related to lifting and vibrations are not opinions that require a specialist, but if they did, Dr. Gates is a specialist in orthopedics. As a physician and orthopedic surgeon, Dr. Gates is qualified to offer the work restrictions opinion in his report. *See Banister v. Burton*, 636 F.3d 828, 832 (7th Cir. 2011) (trauma doctor qualified to testify as to patient's physical abilities, including abilities to throw or crawl, at the time of treatment); *Gayton*, 593 F.3d at 618 (doctor qualified to testify regarding "knowledge that any competent physician would typically possess," such as effects of vomiting on potassium and electrolyte levels in the body).

Thus, the court declines to exclude Dr. Gates's opinion based on his qualifications and turns to Union Pacific's argument about the factual foundation and reliability of Dr. Gates's opinion.

*B. Reliability*

Union Pacific contends that Dr. Gates's work restrictions opinion is unreliable and lacks a factual foundation. Union Pacific argues that Dr. Gates is not Stapleton's treating physician and testified that "I don't give work restrictions per se," that Dr. Gates learned of the supposed work restrictions (no vibrations or

lifting over 50 pounds) only from Stapleton telling Dr. Gates that another doctor had imposed them at some unknown time, that there is no evidence that another doctor ever imposed them, that there is no evidence of a functional capacity evaluation supporting the restrictions, and that Dr. Gates did not perform his own physical restriction examination. Thus, Union Pacific argues, Dr. Gates's work restrictions opinion is "nothing more than an expert supplying a bottom line without any specialized knowledge." (Dkt. 81 at 7.) Union Pacific also argues that the opinion is not based on sufficient facts. (*Id.*)

It is not clear why any of these points prevents Dr. Gates from offering the work restrictions opinion.

As set forth above, *Daubert* set forth a non-exhaustive list of factors to consider when determining the reliability of an expert opinion. *Smith*, 215 F.3d at 719. Indeed, "the reliability test under Rule 702 is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case." *Id.* at 720 (citing *Kumho*, 526 U.S. at 150). "[I]n clinical medicine, the methodology of physical examination and self-reported medical history . . . is generally appropriate." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000). That is the methodology set forth in Dr. Gates's report and described by Dr. Gates in his deposition. In context, Dr. Gates appears to have concluded that *if* he were Stapleton's treating physician (which he is not), work restrictions would be appropriate. More specifically, Dr. Gates said that he would have imposed the restrictions himself if he had seen Stapleton as a regular patient, that he "agree[d]" with the restrictions (although he did not know their source), and that he would doubt Stapleton would be working at any physical job with a spinal cord stimulator. (Dkt. 81-1 at 14–15, Gates Dep. 55:3–59:9.) Dr. Gates based this conclusion on his review of Stapleton's medical records and examination of Stapleton. Union Pacific does not provide authority for the proposition that Dr. Gates could not rely on his review of the medical records and his examination of Stapleton to reach a conclusion that if Dr. Gates were Stapleton's treating physician, work restrictions would be appropriate.

Union Pacific is correct that an expert cannot simply assert a bottom line. *Metavante*, 619 F.3d at 761. Rather, an expert must "explain the 'methodologies and principles' that support his opinion." *Id.* (citations omitted). Dr. Gates's report states that he reviewed Stapleton's medical records, prepared a chronological summary of those records, interviewed Stapleton, and examined Stapleton. (Dkt. 90-1.) As a physician, he may rely on his education, training, and experience, as well as Stapleton's medical records, to provide an opinion based on Stapleton's physical health and any limitations. *See Cooper*, 211 F.3d at 1020; *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). Moreover, "[m]edical professionals reasonably may be expected to rely on self-reported patient histories. . . . Such histories provide information upon which physicians may, and at times must, rely

in their diagnostic work." *Walker*, 208 F.3d at 586.  Dr. Gates's work restrictions opinion is not simply a bottom line, and it is based on sufficient facts.  To the extent Union Pacific questions the factual basis of Dr. Gates's opinion, Union Pacific's criticisms go to the weight of Dr. Gates's opinion, not its admissibility.  *See Smith*, 215 F.3d at 718; *Cooper*, 211 F.3d at 1021.  Union Pacific may question Dr. Gates about the factual basis of his opinion on cross-examination.

In its reply, Union Pacific argues that Dr. Gates did not consider the permanent restrictions that Union Pacific placed on Stapleton related to a seizure condition, and did not address whether the Union Pacific restrictions affect Stapleton's ability to work, apart from any injury from the January 2015 incident. (Dkt. 93 at 3.)  Union Pacific mentioned the Union Pacific work restrictions in its opening memorandum, but did not develop the argument there that Dr. Gates's silence on the Union Pacific restrictions undermined his opinion.  The court would hesitate to exclude Dr. Gates's opinion based on an argument undeveloped in the opening brief.

In any event, at this stage, it is difficult to evaluate this argument without more context and information about how the parties plan to rely on the Union Pacific work restrictions and Dr. Gates's opinions.  The Union Pacific work restrictions certainly appear to be significant to the parties' arguments and there are indications in the briefs that the parties may dispute the basis of the restrictions. (*See* Dkt. 90 at 10–11; Dkt. 93 at 1 n.1.)  But the parties have yet to spell out these arguments or describe comprehensively the law or evidence that may bear on them.  The *Daubert* briefs at times touch on the law and facts relevant to causation and damages, but do not present these issues squarely.

Nor did Union Pacific ask Dr. Gates at his deposition about the effect of the Union Pacific restrictions.  Dr. Gates was aware of a 2006 seizure; he mentioned the 2006 seizure in his report (Dkt. 90-1 at 2) and was asked briefly about its cause at his deposition (Dkt. 81-1 at 3).  As best the court can tell, Dr. Gates also was aware of the Union Pacific work restrictions; to prepare his report, he reviewed Stapleton's medical records, including the fitness for duty determination made by Union Pacific's Chief Medical Officer.  (Dkt. 113 at 20, item 9.)  But he was not asked about the Union Pacific restrictions at his deposition.

The parties will have the opportunity to develop their arguments further at trial, and Union Pacific will have the opportunity to cross-examine Dr. Gates on the significance of the Union Pacific restrictions and the factual basis of Dr. Gates's opinions.  At that point, Union Pacific could potentially renew this argument if appropriate.  *See Chaudhry v. Provident Life & Accident Ins. Co.*, No. 12-cv-05838, 2015 WL 1756832, at *5 (N.D. Ill. Apr. 15, 2015) ("Because this is a bench trial, the need for the Court to determine the reliability of Dr. Carman's testimony prior to hearing her testimony is lessened. . . . Accordingly, the Court, in its discretion,

denies Plaintiff's motion without prejudice to Plaintiff raising the issue at trial when additional testimony and context is provided by Dr. Carman."); *Levin v. Grecian*, No. 12-cv-00767, 2013 WL 3669742, at *5 (N.D. Ill. July 12, 2013); *Jacobsen v. Oliver*, No. CIVA 01-1810 PLF, 2007 WL 5527513, at *1 (D.D.C. Nov. 2, 2007). At this stage, without more context from the parties about the significance of the Union Pacific work restrictions to their arguments, and about any relationship between those restrictions and Dr. Gates's proposed testimony, Dr. Gates's silence on those restrictions is not a sufficient basis to exclude the work restrictions opinion.

Union Pacific's motion to exclude Dr. Gates's work restrictions opinion is denied.

## III. Stapleton's Vocational Rehabilitation Expert Terry L. Cordray

Stapleton retained Terry L. Cordray, a certified rehabilitation counselor, case manager, and vocational rehabilitation practitioner, to conduct "a vocational assessment to determine the impact of medical problems, secondary to a work-related injury of January 19, 2015, upon his vocational capacities." (Dkt. 89-1 at 6.) Cordray provided an initial report and a supplemental report (Dkt. 89-1) and was deposed (Dkt. 83-2).

Cordray concluded from two sources—medications prescribed by Dr. Brooks and Dr. Gates's opinions regarding Stapleton's inability to work—that Stapleton could not return to his job. (Dkt. 89-1 at 3–5.) As to Dr. Brooks's prescription of medications, Cordray noted that in records he reviewed, "Dr. Brooks, as recently as July 17, 2016, continued to provide medication which precluded Mr. Stapleton from performing his job as a conductor/locomotive engineer." (*Id.* at 3.) (Cordray then noted that "[n]o final physical restrictions have been provided in regards to Mr. Stapleton's functional abilities." (*Id.* at 3.)) As to Dr. Gates's report, Cordray quoted the "Impressions" and "Disability" sections of Dr. Gates's report, including the sentence that "[t]here should be work restrictions of no vibrations and no lifting greater than 50 lbs," and concluded that "[b]ased upon the comments of Dr. Gates, it continues to be my opinion that Mr. Stapleton cannot return to his heavy job as a conductor/locomotive engineer," as "[t]he job of a railroad conductor is very physically demanding." (*Id.* at 3–4.)

As to the seizure issue, Cordray wrote, "I understand some comment has been made regarding Mr. Stapleton being withheld from service as a conductor/locomotive engineer by Union Pacific, not for injuries sustained on January 19, 2015, but for diagnosis of epilepsy." (*Id.* at 4.) He then cited the depositions of two of Stapleton's treating physicians, Dr. Shah and Dr. Buvanendran, and said that "[b]ased upon the comments of Dr. Shah, who had treated Mr. Stapleton, there is no information provided in the medical records

indicating Mr. Stapleton has a seizure condition for which he should be withheld from service as a conductor/locomotive engineer." (*Id.*)  He continued, "Therefore, in my opinion, the physical restrictions that have been recommended by Dr. Gates and the medication prescribed by Dr. Brooks for the physical injuries sustained on January 19, 2015, preclude Mr. Stapleton from performing his job." (*Id.* at 5.)

At his deposition, Cordray clarified that he doesn't "give an opinion on causation or mechanism of injury." (Dkt. 83-1 at 12, Cordray Dep. 45:2–3.)  He explained, "My opinion is based upon the medical restrictions that I've reviewed and the medications that he's currently required to utilize, he is not qualified to work as a locomotive engineer," regardless of and setting aside the seizure issue. (*Id.* at 13, Cordray Dep. 49:6–17.)  He also said that he was not giving an opinion on whether Stapleton has a seizure disorder, that he was simply repeating doctors' opinions, and "I'm going to let doctors decide whether this gentleman has a seizure disorder. He's not able to do his job, in my opinion, based solely on his restrictions for his back injury." (*Id.* at 16–17, Cordray Dep. 63:10–65:23.)  He modified his comments in the report on whether Stapleton would be employable if he had been diagnosed with a seizure disorder, and clarified that he was leaving the question of the seizure condition to the doctors. (*Id.* at 17, Cordray Dep. 65:8–67:13; *see also id.* at 18, Cordray Dep. 69:14–70:1.)

Union Pacific does not challenge Cordray's qualifications, but in any event, as a certified rehabilitation counselor and vocational rehabilitation practitioner with over 43 years of professional experience, Cordray has the requisite knowledge, skills, education, and experience to offer the opinions in his report. (*See* Dkts. 89-1 at 5; 89-3.)

Union Pacific argues that Cordray's testimony is unreliable and lacks an adequate foundation.

Union Pacific argues that the two bases for Cordray's opinions lack evidentiary support.  As to the first basis, the work restrictions opinion in Dr. Gates's report, Union Pacific contends that Cordray cannot rely on that opinion by Dr. Gates, for the same reasons Union Pacific moves to exclude that opinion.  Those reasons are discussed in the previous section.  As explained there, Union Pacific's factual criticisms go to the weight of Gates's opinions, not their admissibility, at least at this stage.  *See Smith*, 215 F.3d at 718; *Cooper*, 211 F.3d at 1021.

As to the second basis, Dr. Brooks's prescription of medications, Union Pacific argues that Dr. Brooks testified at her deposition that she did not restrict Stapleton's ability to work.  Dr. Brooks did give this testimony at her deposition. (Dkt. 83-4 at 8, Brooks Dep. 31:12–14.)  Cordray said at his deposition that he does not "give an opinion on causation or mechanism of injury," "[t]he fact that there is a physical restriction is basically enough," and he is "not a safety expert or will not

give an opinion on causation." (Dkt. 83-1 at 12, Cordray Dep. 45:2–3, 45:9–12.) Essentially, he appears to have been saying that he relies on other experts, including doctors, for medical and causation opinions. He did not say, however, that physical restrictions by a doctor are necessary, or that prescribed medications are not sufficient. Elsewhere in his deposition, he said that "[m]y opinion is based upon the medical restrictions that I've reviewed and the medications that he's currently required to utilize, he is not qualified to work as a locomotive engineer." (*Id.* at 13, Cordray Dep. 49:9–12.) And he acknowledged in his report that "[n]o final physical restrictions have been provided in regards to Mr. Stapleton's functional abilities" (Dkt. 89-1 at 3); yet he still relied on Dr. Brooks's prescription of medications (*id.*). To the extent there may be any potential inconsistency here, Union Pacific can explore it on cross-examination.

Union Pacific also points to Cordray's deposition testimony that he does not know what treatment Stapleton currently is receiving. (Dkt. 83 at 4, 7; Dkt. 83-1 at 13.) But just before that portion of the deposition, Cordray testified that Stapleton had relayed to him two days before the deposition that he was taking certain medications. (Dkt. 83-1 at 13.) This is a matter for cross-examination.

Second, Union Pacific contends that because Cordray did not consider the work restrictions Union Pacific's doctors placed on Stapleton as a result of the seizure condition, and because Cordray does not know which jobs Stapleton could perform with a seizure condition, Cordray lacks a foundation to offer vocational opinions. But Cordray clarified at his deposition that he was limiting his opinions to the vocational consequences of Dr. Gates's opinions and Dr. Brooks's records, and setting aside what Cordray described as a debate among doctors over the seizure disorder. (Dkt. 83-1 at 13, Cordray Dep. 49:6–17; *id.* at 16–17, Cordray Dep. 63:10–65:23.) For similar reasons as discussed above with respect to Dr. Gates's testimony, the court does not yet have full context for this aspect of Cordray's testimony, because the significance of the Union Pacific work restrictions to the parties' arguments and the associated factual disputes remain to be developed by the parties. As best the court can tell at this stage, Cordray's clarification of the scope of his testimony goes to its weight, not its admissibility. Union Pacific may cross-examine Cordray about the restrictions imposed by Union Pacific's doctors and the scope of Cordray's testimony.

Union Pacific's motion to exclude Cordray's testimony is denied without prejudice to renewal at trial or an appropriate time.

## IV. Stapleton's Damages Expert Malcolm S. Cohen, Ph.D.

Stapleton retained Malcolm S. Cohen, Ph.D. to "determine the economic loss resulting from the injury of Kelly Stapleton." (Dkt. 85-1 at 1.) Cohen provided a report (Dkt. 85-1) and has been deposed (Dkt. 85-2). Union Pacific seeks to exclude

Cohen's wage loss calculation as irrelevant and unreliable. First, Union Pacific argues that "Dr. Cohen's wage loss calculation is irrelevant because he based the calculation on Plaintiff's earnings as a Locomotive Engineer and this Court already has ruled that Plaintiff cannot work as an Engineer because of his seizure condition, not because of any restrictions related to Plaintiff's claimed FELA injury." (Dkt. 85 at 1.) Second, Union Pacific argues that "Dr. Cohen's opinions are unreliable because: (1) there is no evidence that Plaintiff is restricted from working as a result of the claimed . . . FELA . . . injury; and (2) Dr. Cohen did not take into account all necessary information when reaching his conclusions." (*Id.*)

Union Pacific does not challenge Cohen's qualifications to offer the expert testimony at issue here, but in any event, Cohen is qualified to do so. Cohen has doctoral and undergraduate degrees in economics; has taught and written in the fields of economics, statistics, and labor relations, among others; and now serves as the President of the Employment Research Corporation. (Dkt. 88-1 at 12–21.)

*A. Relevance*

Union Pacific argues that Cohen's opinions are irrelevant. The argument is that Cohen's calculation is based on the wages of an engineer, but in Union Pacific's view, Judge Wood determined in the partial summary judgment ruling that Stapleton "cannot work as an Engineer because to do so with his seizure condition is a violation of Union Pacific's Safety Policy," and thus regardless of any alleged injury from the January 2015 incident, Stapleton cannot work as an engineer. (Dkt. 85 at 1, 5–6.)

The court is not convinced that the partial summary judgment ruling requires the exclusion of Cohen's testimony. The ruling held that the FRSA's safe harbor provision shielded Union Pacific from liability for a FRSA retaliation claim because Union Pacific's refusal to allow Stapleton to return to work fell within the language of the safe harbor provision. (Dkt. 60 at 5–6.) That provision states, as relevant, that "a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to . . . , if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty." (*Id.* at 6 (quoting 49 U.S.C. § 20109) (emphasis omitted).) The ruling held that Union Pacific acted pursuant to its medical standards for fitness for duty. The court therefore granted summary judgment on the FRSA claim.

The court did not reach Union Pacific's other arguments on the FRSA claim— arguments regarding whether Stapleton could establish a *prima facie* case under the FRSA or whether Union Pacific would have taken the same actions with respect to Stapleton's employment regardless of his reports. (Dkt. 60 at 5–6.) The court thus did not address causation in the context of either of those arguments.

Moreover, the summary judgment motion was limited to the FRSA claim. The FELA claim was not before the court. Causation is an element of a FELA claim. *Abernathy v. E. Illinois R.R. Co.*, 940 F.3d 982, 988 (7th Cir. 2019). Causation for purposes of the FELA claim was not before the court at summary judgment, was not addressed in the ruling, and remains a question for trial.

Once again, evaluating Union Pacific's relevance argument is difficult without more context for how the parties plan to address the Union Pacific work restrictions for purposes of the FELA claim. The *Daubert* briefs touch on the law and facts relevant to causation and damages, but do not fully ventilate these issues. (*E.g.*, Dkt. 88 at 3–4; Dkt. 94 at 4–6.) As a result, the court cannot yet determine whether Cohen's lost wages opinions are relevant. Union Pacific may reassert its relevance argument at trial or an appropriate time when the parties have presented these issues. *See Chaudhry*, 2015 WL 1756832, at *5; *Levin*, 2013 WL 3669742, at *5; *Jacobsen*, 2007 WL 5527513, at *1.

## B. Reliability

Union Pacific argues that Cohen's opinions are not based on sufficient facts. Specifically, Union Pacific contends that (1) Cohen improperly calculates lost wages based on an engineer's salary when the court already determined Stapleton cannot work as an engineer, (2) for the same reasons as in Union Pacific's motions to exclude the Gates and Cordray testimony, there is no factual basis for work restrictions related to the collision, and thus no factual foundation for Cohen to opine that Stapleton is entitled to lost wages related to the collision, and (3) Cohen failed to consider a variety of relevant materials, some of which Union Pacific argues Cohen testified he typically would consider: Stapleton's BA-6,[3] the difference between the G-90 and Stapleton's tax returns, the salaries of other Union Pacific engineers, Union Pacific's records of Stapleton's salary, and Cordray's February 7, 2019 report. (Dkt. 85 at 6–8.)

The court has already addressed the first two arguments. As explained above, the court declines to grant the motion on these bases, without prejudice to Union Pacific's ability to raise the arguments at trial or an appropriate time.

The third argument goes to the weight of Cohen's testimony, not its admissibility. *See Smith*, 215 F.3d at 718; *Cooper*, 211 F.3d at 1021. Among other materials, Cohen reviewed Cordray's January 13, 2016 report, Stapleton's 2013–2015 tax returns, his G-90d service and compensation report for 2005–2015, and paid benefits information for 2015–2017. (Dkt. 88-1 at 2–3.) Union Pacific questioned Cohen at his deposition about his reliance on various materials and not on others, and may explore these issues further during cross-examination.

---

[3] Neither party sufficiently explains what a BA-6 is or its significance.

## CONCLUSION

Stapleton's motion to exclude the testimony of Anne Mathias [78] and Union Pacific's motions to exclude certain testimony of Dennis Gates [80], the testimony of Terry Cordray [82], and the testimony of Malcolm Cohen [84] are denied.

Dated: May 29, 2020                         /s/ Martha M. Pacold